**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MICHIGAN
EASTERN DIVISION**

HOWARD GOLDFADEN, DPM,

<em>Plaintiff</em>,

     vs.                             Case No. – 24-CV-

XAVIER BECERRA, in his official
capacity as   Secretary of the Department
of   Health   and   Human   Services,
ADVANCEDMED CORPORATION;
NCI INFORMATION SYSTEMS, Successor to
ADVANCEDMED CORPORATION; EMPOWER
AI, Successor to NCI INFORMATION SYSTEMS
and ADVANCEDMED CORPORATION;

<em>Defendants</em>.

<strong>COMPLAINT</strong>

Plaintiff HOWARD  GOLDFADEN, DPM (GOLDFADEN), seeks  mandamus  relief

against  XAVIER  BECERRA, in his  official  capacity  as  the Secretary ("Secretary") of the

Department of Health and Human Services ("HHS") for violations of  Title  XVIII  of  the

Social  Security  Act ("the Medicare  Act") and  its  relevant  rules  and regulations including

but not limited to 42 CFR Part §§405 et seq and in derogation of 42 USC 1320c-6(b),  for

damages  sounding  in  p a r t  i n  Fraud,  individually  and  through  an  a c t i o n  against

ADVANCEDMED   CORPORATION   and/or   NCI   INFORMATION   SYSTEMS,   INC.

d/b/a ADVANCEMED, an NCI Company (collectively "ADVANCEMED").

## INTRODUCTION

1.      The Centers for Medicare and Medicaid Services ("CMS") rules provide that in the case of payment suspension initiated against a provider by a Zone Program Integrity Contractor ("ZPIC") that the provider be given the opportunity to submit a rebuttal statement within a time certain.

2.      The CMS rules require that the ZPIC at the guidance of CMS review not only the rebuttal statement but also all documentation submitted with the rebuttal statement.

3.      That following ADVANCEMED's notice of a payment suspension directed to GOLDFADEN and submission by GOLDFADEN of a timely filed rebuttal statement ("rebuttal statement"), ADVANCEMED, in its stead as a ZPIC, responded ("response") asserting that it reviewed the rebuttal statement in its entirety including additional medical documentation in support of claims for payment advanced by GOLDFADEN ("additional documentation').

4.      Contrary to the response, ADVANCEMED's has admitted that it is their policy to never review additional documentation submitted with rebuttal statement and that CMS has instructed ADVANCEMED not to review the additional documentation

5.      ADVANCEMED's failure to review the additional documentation is in violation of the Medicare Act and applicable rules and regulations and its Statement of Work with CMS.

6.      ADVANCEMED's statement that it would & did review the supplemental records was fraudulent.

## PARTIES

9.      The Centers for Medicare & Medicaid Services ("CMS"), a unit of the Department of Health and Human Services ("HHS"), acts as the Secretary's designee in overseeing the Medicare program.

10.      That ADVANCEMED CORPORATION is a foreign corporation doing business in the State of Michigan and conducts business under the identity of ADVANCEMED, an NCI Company.

11.      That NCI INFORMATION SYSTEMS, INC. ("NCI") is a foreign corporation doing business in the State of Michigan and conducts business under the identity of ADVANCEMED, an NCI Company.

12.      That for purposes of this Complaint, ADVANCEMED CORPORATION and NCI INFORMATION SYSTEMS, INC. are referred to collectively as ADVANCEDMED.

13.      ADVANCEMED is a Zone Program Integrity Contractor ("ZPIC") providing services to CMS pursuant to an agreement between ADVANCEMED and CMS and conducts business in the State of Michigan.

14.      CMS is responsible to ensure that ZPICs including ADVANCEMED provide services to CMS in compliance with all laws, including but not limited to the Medicare Act and all applicable rules and regulations.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over this case pursuant to the Medicare Act and all applicable rules and regulations.

16.      Venue in this Court is proper under 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

3

17.     Plaintiff was and is a licensed Medicare provider and provides home health services to qualified Medicare recipients.

18.     The Secretary of HHS has delegated the responsibility of administering the Medicare CMS program, which in turn contracts with private entities, such as ADVANCEMED, to administer various aspects of the program.

19.     ADVANCEMED, as a Unified Zone Program Integrity Contractor ("UPIC") for CMS, has an investigative function and is tasked with data mining of claims and examining related medical records to identify suspected patterns of Medicare fraud. ADVANCEMED has the authority to request from CMS a suspension of payments to a provider.

20.     However, a UPIC Contractor can only request approval to suspend Medicare reimbursement payments to a provider if the contractor "possesses reliable information that an overpayment exists," 42 C.F.R. § 405.371(a)(1) or if the "contractor has consulted with the OIG, and, as appropriate, the Department of Justice, and determined that a credible allegation of fraud exists." 42 C.F.R. § 405.371(a)(2).

21.     Medicare Administrative Contractors ("MACs") are tasked with processing and paying claims, examining medical records to uncover clerical errors and policy misinterpretations and educating providers on how to improve the quality of the medical records by using a process that follows the Improper Payment Outreach and Education law. 42 U.S.C. §1395kk–1(h)(1).

22.     Under 42 U.S.C. §1395kk–1(h)(1), the Improper Payment and Outreach laws, MACs rarely suspend payments but instead recover payment for claims that do not meet standards, educate the Provider on how to correct errors which "are due to clear misapplication or misinterpretation of Medicare policies or are clearly due to common and inadvertent clerical

4

or administrative errors" and then give the Provider time to improve documentation quality before requesting additional medical records.

23.     UPIC's have the option of referring providers to MACs to follow the Improper Payment Process as stated in 42 U.S.C. §1395kk–1(h)(1) rather than continuing the investigation and using the Suspension Process as stated in 42 C.F.R. §405.372(d)(1) when their initial examination of medical records is complete.

24.     In pursuing its responsibility of data mining claims of Medicare providers, ADVANCEMED reviewed past claims of Plaintiff for which reimbursement from Medicare had already been received and requested medical records for further examination.

25.     Without any adequate warning or notice, ADVANCEMED had Plaintiff's Medicare payments suspended.

26.     The HHS Secretary has authority over the Medicare program.

27.     The Centers for Medicare & Medicaid Services ("CMS"), a unit of the U.S.

28.     Department of Health and Human Services ("HHS"), acts as the Secretary's designee in overseeing the Medicare program.

29.     ADVANCEMED is a corporation doing business in the State of Michigan.

30.     ADVANCEMED was a Unified Program Integrity Contractor1 ("UPIC") providing services to CMS pursuant to an agreement between ADVANCEMED and CMS.

31.     CMS is responsible to ensure that UPICs, including ADVANCEMED, provide services to CMS in compliance with all laws, including but not limited to the Medicare Act and all applicable rules and regulations.

32.     Licensed home healthcare providers, like Plaintiff, travel and provide services to patients in their homes who would normally not be able to obtain care due to their inability to travel outside their homes without significant and burdensome efforts or where illness or injury would make such travel dangerous.

33.     In many cases, without the services of Plaintiff, patients would not receive adequate and in some cases any care, such that the patients' health would decompensate forcing these patients to be treated in emergency rooms and ultimately be admitted to more intense facilities that would greatly increase the cost to the Medicare program.

34.     Pursuant to the mandate of Congress as part of CMS' oversight of the Medicare program, including the Medicare Program Integrity Manual ("PIM"), CMS has promulgated certain fraud and error detection oversight processes to ensure solvency of the Medicare Trust Fund.

35.     These fraud and error detection oversight processes include the creation by CMS of contractor entities to assist CMS, including Medicare Administrative Contractors ("MACs"), Zone Program Integrity Contractors (ZPIC's) and more recently Unified Program Integrity Contractors ("UPIC's").

36.     The primary purpose of MACs is to process and pay claims, educate providers on how to improve the quality of medical records and are governed under 42 U.S.C. §1395kk-1 ("§1395kk-1").

37.     The primary purpose of ZPICs (now UPICs) is to use data mining to uncover overpayments or patterns of fraud and to refer fraud suspects to law enforcement for further investigation and consultation under 42 C.F.R. §405.371 ("§405.371") and 42 C.F.R. §405.372 ("§405.372").

38.     While both MACs and UPICs in different ways administer to the Medicare program, Congress has clearly mandated that their roles and activities are not the same. To be certain, §1395kk-1(5)(A) specifically mandates that the Secretary ensure that the functions of MAC **do not** duplicate activities of the UPICs.

39.     MACs are responsible for the financial administration of the Medicare program.

40.     MACs engage in a process known as Targeted Probe and Educate ("TPE") that follows the Improper Payment Outreach and Education law (§1395kk–1(h)(1)) whereby a MAC engages with a Provider through multiple iterations of requesting groups of medical records, examining those records, educating the Provider as to how to correct the administrative or clerical deficiencies, seeking repayment for those records that fail to meet requirements, and several weeks later requesting another group of medical records to determine if their education was effective.

41.     The TPE Program provides sufficient administrative process with remedies to recoup repayment of claims in which medical records were found to have clerical errors or policy misinterpretations that resulted in non-compliance with Medicare rules and regulations.

42.     The purpose of UPIC's (which were called ZPICs prior to 2017) is to ensure the integrity of the Medicare program by identifying cases of suspected fraud through the use of data analytics.

43.     Unlike the MACs, the primary mandate of the ZPICS/UPICs is to perform statistical analysis ("claims data mining") to identify overpayments or patterns of fraud, request the medical records associated with the suspected pattern, and referring cases of confirmed fraud to law enforcement in compliance with Chapter 4 of the Medicare Program Integrity Manual

("PIM"). That nowhere in the PIM is a UPIC authorized to supplant the administrative activities

granted to the MAC under §1395kk-1(5)(A).

44.     As part of its mandate, the UPICs, under §405.372, may request payment

suspensions for Providers only when Contractor (1) has consulted with law enforcement and

determined that a credible allegation of fraud exits, or (2) possesses reliable  information that an

overpayment exists.

45.     In 2013 and 2014, as evidenced in the 2015 annual report on fraud from CMS to

Congress (See "Exhibit A" hereto), the success of ZPIC program in using data analysis

techniques to generate referrals to law enforcement were in significant decline resulting in both

CMS and Congress questioning the value of the ZPIC program.

46.     Between 2013 and 2014, as also evidenced in the 2015 annual report on fraud

from CMS to Congress, recovered funds from payments suspensions resulting from ZPIC data

analysis efforts only grew by $9 Million.

47.     In 2015, CMS announced that the ZPIC program would end in 2016, to be

combined with three other integrity programs under the new name of the UPIC program  and

that all current ZPICs would have to engage in a competitive bidding process to win the new

UPIC contract.

48.     As a result of the potential loss of the lucrative contract, there existed significant

motivation for ZPICs, including ADVANCEMED, to find additional methods to inflate the

number of providers it put out of business and the amount funds it recovered for purposes of

submitting a more competitive bid.

49.     It is through these additional methods, including the improper use of payment

suspensions and the extrapolation of past debt, that ADVANCEMED exceeded its mandate.

50.     On information and belief, to inflate its billable hours and to improve its performance metrics ADVANCEMED in 2015 began a course and pattern of practice whereby it would identify cases involving minor policy misinterpretations, correctable ministerial omissions or clerical errors in the medical records that it classified as significant overpayments, because their contract with CMS pays them by the hour to examine medical records, rather than referring providers to MACs which would apply the Improper Payment and Outreach law, ADVANCEMED engaged in the extraordinary action of requesting CMS to approve payment suspensions when there only existed minor overpayments that should have been referred to a MAC.

51.     On information and belief, ADVANCEMED in 2015 then began sending two different suspension activation letters to all providers whose suspension requests had been approved by CMS.

52.     On information and belief, providers in which no law enforcement consultation had taken place were initially informed that the suspension was based on reliable information that an overpayment exists and if the provider responded with rebuttal letter, ADVANCEMED frequently changed the reason for the continuation of the suspension to fraud but without the required consultation with law enforcement.

53.     On information and belief, providers in which there was actual consultation with law enforcement were correctly informed that the suspension was based on credible allegations of fraud.

54.     When comparing 2013 and 2014 in the CMS annual report to Congress on fraud, recovered funds from UPIC initiated payment suspensions increased by only $9 million whereas recovered funds from suspensions between 2014 and 2015 increased by $75 million, 750%

greater increase than in the previous year, as a result of these new methods ADVANCEMED
had put in place in 2015.

55.     As a result of ADVANCEMED's improved performance resulting from their
improper application of the regulations, ADVANCEMED was awarded a $76.8  million dollar
contract in July of 2018 to be the UPIC for the eleven state Midwest Jurisdiction.

56.     On information and belief, since 2016, ADVANCEMED continues to implement
payment suspensions by informing the provider that an overpayment was the reason to
implement the payment suspension and overwhelming the provider by simultaneously requesting
thousands of pages of additional documents as well as a rebuttal statement, all of which are due
within the same 15-day period. For many of providers who are able to fulfill the information
request, ADVANCEMED then changes the reason to continue the suspension to the rebuttal
letter from "overpayment" to "fraud", without obtaining the required consultation with law
enforcement, knowing full well that the law prevents providers from appealing all responses to
rebuttal letters.

57.     On information and belief, ADVANCEMED uses the results of these improper
methods to inflate its billable hours to CMS and to also bolster its performance in terms of both
recovered funds and the number of providers put out of business, both of which are consolidated
with the performance of other UPICs in the CMS annual fraud report to Congress.

58.     In May 2018, ADVANCEMED's parent company (NCI) won an additional $44
million contract with CMS to be the Payment Error Rate Measurement (PERM) Review
Contractor, which NCI asserts was based largely on ADVANCEMED's reported performance in
the prior three years.

59.     On information and belief, ADVANCEMED has and currently engages in a pattern and practice of targeting small home healthcare providers like Plaintiff with limited budgets and limited legal expertise, issuing requests for medical records for the sole purpose of finding minor policy misinterpretations or clerical errors in medical records that it could misclassify as significant overpayments.

60.     On information and belief, once ADVANCEMED identifies minor clerical errors and policy misinterpretations through data mining, rather than referring the provider to a MAC for education specifically prescribed by the Improper Payment Outreach and Education program (§1395kk–1(h)(1))), ADVANCEMED requests approval from CMS for a payment suspension stating that it has the evidence to justify a payment suspension.

61.     On information and belief, the process used by ADVANCEMED to request approval from CMS to start or continue payment suspensions is confidential and it is unknown at this time if ADVANCEMED misleads CMS when making these requests.

62.     In furtherance of its efforts to inflate billable hours and to report improved performance to CMS, ADVANCEMED simultaneously with the start of an overpayment based payment suspension, offers the provider an opportunity to send a rebuttal letter, starts a prepayment review of new claims, requests a second much larger collection of medical records for a post payment review, and using the review of the requested records to not only request additional repayments, but to effect a high payment error rate it can later use to justify an extrapolation of debt.

63.     On information and belief, in its response to the rebuttal letter that only a few providers are able to send, ADVANCEMED continues the payment suspension while changing its assertion of "overpayment" to "fraud" without obtaining the consultation with law

enforcement that is required by §405.372(a)(4)(i) knowing full well that that law prohibits a provider from appealing any decision to continue the suspension.

64.    On information and belief, ADVANCEMED alleges policy interpretation errors in requested records that are not supported by Medicare regulations as part of its efforts to inflate billable hours and to allege a high level of payment errors that will justify extrapolation.

65.    On information and belief, from these additional medical records, ADVANCEMED then conducts a random selection of records it has examined to compute an alleged high payment error rate that it applies against the providers' previous 4 years of payments to produce a theoretical "extrapolated debt" that is generally in the millions of dollars, resulting in such a substantial debt load that the provider under suspension cannot resume operation after the suspension is lifted. Notification of the extrapolated amount is provided commensurate with the notice of lifting of the payment suspension and prepayment review.

66.    This use of debt extrapolation is permitted under 42 U.S.C. §1395ddd(f)(3) only "(a) when there is a sustained level of high payment error; or (b) documented educational interventions has failed to correct the payment error."

67.    Notably, there is no administrative or judicial review under §1395ff of determinations by the Secretary of sustained or high levels of payment errors.

68.    The net effect of the above suspension process is that once the home healthcare provider is placed on payment suspension, very few providers including Plaintiff are able to remain solvent and face the shut down of their practices.

69.    ADVANCEMED's additional use of extrapolated debt following a payment suspension results in virtually no providers being able to resume operations after the suspension

is lifted, thereby improving ADVANCEMED's reported performance to CMS in terms of the number of providers it successfully puts out of business.

70.     As contained within the files of Defendants, the below referenced pertinent events transpired over a period of years as between Plaintiff and Defendants, or related to them.

64.     On September 11, 2018 ADVANCEMED opens an investigation against Howard Goldfaden, DPM (Plaintiff)

71.     On December 20, 2018 Eboni Rousell at ADVANCEMED sends Plaintiff a request for the Probe Audit of 30 claims on client accounts.

72.     ADVANCEMED sends Plaintiff a 100% denial rate for his statistical audit.

73.     On January 20, 2019 Eboni Rousell sends Plaintiff a letter as a follow up from December 18, 2020 conference.

74.     On May 12, 2019 ADVANCEMED issued a receipt on Plaintiff's statistical sample.

75.     In December 2018 ADVANCEMED had already contacted ten of Plaintiff's patients.

76.     On May 29, 2019 CMS Statistics showed that out of 47,000 RAC Medicare Part B determinations that were appealed in fiscal 2015, 70% were overturned in the provider's favor.

77.     On June 1, 2019 CoventBridge Inc. (US) acquired the midwestern jurisdiction from ADVANCEMED.

78.     On June 24, 2019 ADVANCEMED implemented a Medicare approved suspension of Medicare payments for Plaintiff allegedly based on reliable information that an overpayment existed.

79.     On June 26, 2019 C2C Innovative Solutions - ADVANCEMED requested a second set of records to a statistical audit and allegedly reviewed 47 claim samples involving 121 claim lines and gave Plaintiff a 100% denial rate and a 93.52% error rate.

80.     On June 26, 2019 ADVANCEMED requested 50 more claim lines.

81.     On July 7, 2019 a FOIA Request was made by Plaintiff to Barbra Gomez at ADVANCEMED requesting all records be forwarded along with all files to his attorney, Boyd E. Chapin.

82.     On July 8, 2019 Plaintiff sent a letter to Barbara Gomez, regarding the suspension of Medicare payments and addressing his FOIA request.

83.     In June 2019 Plaintiff was suspended from receiving payments.

84.     In or about June 2019 Plaintiff communicated with his professional liability carrier PICA and it assigned the matter case to attorney J. Kevin West of Parsons Behle & Latimer (West) for representation.

85.     On July 11, 2019 ADVANCEMED sent a secondary letter indicating they are about to begin a pre-payment review Plaintiff's medical claims.

86.     On July 11, 2019  Barbara Gomez sent Plaintiff a letter stating they received the July 10, 2019 rebuttal statement and told him to send any additional documents for CMS to consider and that they could not forward information to Boyd E. Chapin, Jr. without an Appointment of Representation (AOR).

87.     On July 24, 2019 Plaintiff sent a letter to ADVANCEMED regarding Ms. Gomez' June 26, 2019 letter, showing the status of 12 patient charts.

88.     On July 30, 2019 ADVANCEMED received Plaintiff's patients' medical records and gave a 100% denial rate stating they were not reasonable nor necessary.

89.     On July 30th and 31st, 2019 Barbara Gomez left a voicemail stating they need eight (8) more charts.

90.     Plaintiff had been waiting for HIPPA forms from ADVANCEMED, which had been requested numerous times but never provided to him.

91.     On August 30, 2019 Plaintiff sent ADVANCEMED a letter stating that they are not responding and are communicating with him as though he is not answering them.

92.     On September 11, 2019 ADVANCEMED sends Plaintiff a letter about the suspension rebuttal and Freedom of Information Act (FOIA) request, which stated they submitted the FOIA request to the FOIA office.

93.     On July 29, 2019 ADVANCEMED Receives Certified Mail Plaintiff including all of the requested materials, and E. Louallen acknowledged receipt of the items

94.     On September 16, 2019 ADVANCEMED sent a letter to Plaintiff stating that he did not reply to the June 26, 2019 request for medical records.

95.     On September 29, 2019 Plaintiff sent a letter to ADVANCEMED about the previous records request on 6/26/2019 and 7/24/2019, and that they have been sent through certified mail and otherwise.

96.     Louallen signed for them on July 29, 2019 at 9:33am.

97.     ADVANCEMED states that Plaintiff is in violation of 42 CFR 424.5(a)(6) although they are not acknowledging Plaintiff's communications.

98.     In October 2019 Plaintiff was notified by ADVANCEMED that the probe audit stated 100% of the 67 charts were wrong, even though he had been doing his charts the same as always and there was never any issues in the previous six audits.

99.   On October 18, 2019   ADVANCEMED receives medical records, and acknowledges in a December 19, 2019 letter to Plaintiff receipt of the medical records on 7/30/2019 and 10/18/2019.

100.   On November 8, 2019 ADVANCEMED issues Overpayment Estimation to Plaintiff.

101.   On November 25, 2019 ADVANCEMED sent Plaintiff a letter regarding 189 claim lines that are denied 100%, stating the claim lines are for services between 7/02/2018 and 6/27/2019.

102.   On December 19, 2019 ADVANCEMED sent a letter to Chicago attorney Samuel Bernstein, one of Plaintiff's additional attorneys.

103.   On December 19, 2019  ADVANCEMED sent a letter to Plaintiff regarding the extrapolated overpayment recoupment for both the probe audit and the statistical audit. written by Barbara Gomez, CFE of ADVANCEMED for a total of $438,610.76.

104.   On December 31, 2019 West emailed Plaintiff two (2) emails/letters discussing the Medicare Appeals process and that West will be taking the case.

*105.*   Demand letters were sent to Plaintiff on January 3, 2020 and January 17, 2020.

106.    On January 15th, 2020 Plaintiff (through counsel) sent a letter via certified mail to ADVANCEMED specifically requesting all documents related to the post-payment audit and overpayment determination.

107.   CoventBridge Group - Letter - "On January 15th, 2020 The Centers for Medicare and Medicaid Services (CMS) finalized a novation agreement (Novation) between the parties, to formally establish CoventBridge as the prime contractor in place of ADVANCEMED/NCI on the

UPIC Contract. This novation transferred all authorities delegated from ADVANCEMED to CoventBridge."

108.   On January 17, 2020 - Demand Letter - WPS (Wisconsin Physicians Services Insurance Corporation) Government Health Administrators - sent Plaintiff a demand letter stating the audit amounts: $4,122.76 for the probe audit; $434,488.00 for the statistical audit; $438,610.76 Total Demand, Interest every 30 days at 10.125% and requesting full payment by February 15, 2020, also stating a 30 day appeal time. (Received Confirmation: 1/25/2020 by Parsons, Behle & Latimer)

109.   On January 22, 2020: - Harold Berman, J.D. - Article about Medicare's injunction from recouping $8,000,000 in overpayments while there is a delay in the appeals process timeline for years. An additional article regarding the case published by, Courtney G. Tito discussed the case in greater detail and that CMS may delay recoupment for the Administrative Law Judge (ALJ) hearing to occur.

110.   On January 25, 2020: - WPS - Demand Letter to Plaintiff - Confirming Date of Delivery: 1/25/2020 by Parsons, Behle & Latimer, additionally stating they have 15 days from the date of the demand letter (dated January 17, 2020) to respond for rebuttal.

111.   On February 4, 2020, Harold S. Haller PhD, statistical expert created a statistical report based on ADVANCEMED's audit and a second statistical report created in 2022.

112.   The 2022 statistical report explains other ALJ statistician's findings and provided an analysis of the reasons behind ADVANCEMED's invalid audit.

113.   On February 13, 2020 Plaintiff requested a redetermination for all overpayments and all statistical documentation as to ADVANCEMED.

114.    On February 19, 2020 - McDonald Hopkins - Courtney G. Tito - Article about the Texas case stating the ALJ hearing time is backlogged to three to five years.

115.    Plaintiff and West hold discussions about requesting an injunction.

116.    On February 27, Nancy Steinkamp, Sr. Analyst for WPS Government Health Administrators sent an email to West regarding Plaintiff's appeal being received but stated; "It was not timely and therefore recoupment already started and will not be refunded."

117.    On February 28, 2020 West emailed Nancy Steinkamp, regarding her message about the appeal being submitted in an untimely manner.

118.    On March 6, 2020 WPS Nancy Steinkamp, sent West an email discussing the appeal submission timeline and the demand letter previously sent to Plaintiff.

119.    On March 12, 2020 West sent an email to Nancy Steinkamp about recoupment amounts.

120.    On March 16, 2020 WPS Nancy Steinkamp sends West an email stating they did not receive the appeal within 30 days, and they will not be refunding any fees as a result.

121.    On April 7, 2020 MAC & WPS - Redetermination Decision - "The MAC issued a redetermination decision on April, 7th 2020 fully upholding the overpayment determination.", further discuss reasons for their decision and confirming date of delivery of 4/10/2020 by Parsons, Behle & Latimer.

122.    On April 27, 2020 Adrianne J. Ross issued an expert report reviewing 50 patients in the audit against Plaintiff.

123.    On May 20, 2020 Plaintiff again requested a copy of the contractors' file.

124.    On May 21, 2020 CoventBridge sent Plaintiff a letter regarding CoventBridge's Acquisition of the Mid- Western Jurisdiction of ADVANCEMED effective 6/01/2019, and their

novation agreement was finalized on 1/15/2020, and as such CoventBridge became the primary contractor and transfered all authorities from ADVANCEMED to CoventBridge, additionally it also denied all claims except one.

125.    On May 27, 2020 C2C Innovative Solutions - Received Reconsideration Request - "The QIC received a reconsideration request dated 5/20/2020 submitted by Kevin West. The review is a denovo review of the case based on the information provided from all prior levels of review and the appellant."

126.    On June 24, 2020 The QIC responded to Plaintiff.

127.    On July 24, 2020 QIC issued an Unfavorable Decision - Medicare Reconsideration Decision.

128.    On August 4, 2020 WPS - Reconsideration Decision - WPS sent a letter to Plaintiff about the Medicare reconsideration decision dated 7/24/2020.

129.    On August 13, 2020 Plaintiff and West requested review by the ALJ.

130.    On September 22, 2020 C2C sent a letter to West regarding reconsideration request, the decision was unfavorable and it told him he could appeal to an Administrative Law Judge (ALJ), indicating he must file his appeal, in writing, within sixty (60) days; further stated that Medicare will make no more payments to Plaintiff.

131.    On August 17, 2020 ALJ Appeal was received by the OMHA.

132.    On October 19, 2020 West sends a letter via certified mail to WPS regarding the appeal process and their timeline asking to "cease and desist from any collection action relating to the appeal until 60 days after the ALJ decision has been issued".

133.    On March 2, 2021 C2C Innovative Solutions - Medicare Reconsideration Decision - "The QIC received a reconsideration request for the "Appeal Details" section; records contained

in the file are the reconsideration request, medical records/treatment records and redetermination file, which includes several pages of Medicare Appeal's that are termed favorable.

134.    On April 5, 2021 Medicare Reconsideration Decision issued by C2C Innovative Solutions stating Plaintiff should receive a revised Medicare Summary Notice or Remittance Advice from Wisconsin Physicians Service Insurance Corporation within 60 days.

135.    On April 21, 2021 Plaintiff's patient, "L V" received a letter from Medicare regarding the number of visits and codes regarding her coverage.

136.    On November 4, 2021 Plaintiff suffered a heart attack and was hospitalized.

137.    On May 23, 2022 WPS denied the ERS request stating two points; required documentation stated was not submitted and no good faith payment was made.

138.    On August 21, 2022 Harold S. Haller created a secondary Statistical Report for Plaintiff which included ALJ statisticians findings, cases and reports.

139.    On August 26, 2022 Plaintiff emails West's assistant the FOIA and she responded confirming it.

140.    On November 17, 2022 West prepares a brief as the appeal to the Administrative Law Judge from the QIC reconsideration decision.

141.    December 2022 The judge ruled against Plaintiff, and when the Judge asked West for the FOIA Agreement, West stated he did not have it and as a result the ruling was adverse to Plaintiff.

142.    On December 7, 2022 two years after requesting ALJ review, Steve Goga, conducted a telephone hearing, which included West, Dr. Haller (Statistician) Dr. Ross (DPM), Mr. Demi (Coding Specialist) and Dr. Goldfaden (Plaintiff).

143.    On December 12, 2022 Plaintiff sent Senator Peters two letters asking for assistance.

144.    On January 10, 2023 Plaintiff receives a Notice of Decision that is not favorable from the Administrative Law Judge.

145.    On January 23, 2023 West sends a letter to PICA  stating that he wants to drop the case.

146.    On March 10, 2023 West sent The Estate of H. Blair (Attorney) a letter regarding a beneficiary for Plaintiff but not liable for the amount.

147.    On February 26, 2024 PICA  sent a letter to Plaintiff stating they have paid $90,350.64 to Kevin West, Esq. and that he has a remaining balance of $9,649.36 to assist with his case against ADVANCEMED/WPS/CMS.

148.     Plaintiff requested documents from the auditor but it never acknowledged the request.

149.    ADVANCEMED misapplied the criteria in the audit.

150.    Section 1870 of the Act: "A physician is found to be without fault if he exercises reasonable care in billing and accepting payment, i.e., he made full disclosure of all material facts, and based on information available to him, including, but not limited to, the Medicare regulations, he had reasonable basis for assuming that the overpayment was correct."

151.    Specific coding issues applies to this appeal.

152.    Michael Demi, a Podiatry Coding Expert, discussed the probe audit and statistical audit

153.    The total for the probe audit was $4,122.76 and the total for the statistical audit extrapolated overpayment was $434,488.00.

154.     There was a failure to recognize this expert's information and analysis.

155.     Michael Demi also provided oral testimony at the ALJ hearing.

156.     Plaintiff also had an expert podiatrist, Dr. Ross, review, as seen in Exhibit K of West's brief. "Medicare contractors and the ALJ applied arbitrary criteria in denying the nail care services". "The ALJ 'Misunderstood and Misapplied the Medicare Coverage Rules for Routine Footcare."

157.     The attached photographs of Plaintiff's patient's symptoms were not vague by any means, as they were issues for nail avulsions, painful ingrown toenails, minor surgical procedures --> to remove toenails which are not considered routine foot care.

158.      The auditor also denied Plaintiff's submissions stating his medical records were "vague".

159.     Services Not Covered included: 11730 - Avulsion of nail plate; single, 11732 - Avulsion of nail plate; each additional plate, 10060 - Inclusion of drainage of abscess, but there was no written notice of this not being accepted.

160.     Plaintiff was to be "presumed to be without fault" for a period during his audit timeline before 2016.

161.     West argued against Nancy Steinkamp at WPS about dates, as they are collecting interest and found another amount against Plaintiff but  ADVANCEMED is not producing evidence.

162.     On May 23, 2022 there is a denial of the ERS request stating: 1.) The required documentation as stated in the letter, dated 5/3/2022, was not submitted; Good faith payment was not required per ERS request process; Types of medical records not overturned / overturned dated:

5/26/17 (not overturned by third party) vs. dated: 2/20/2019 (overturned by Medicare)  dated:

2/09/16 (not overturned by third party) vs. dated: 11/28/2018 (overturned by Medicare).

163.    Harold S. Haller, PhD created two (2) Statistical Reports for Plaintiff's case against

ADVANCEMED.

164.    In the February 4, 2020 Statistical Expert Report, Haller is retained by the

Administrative Law Judges (ALJs).

165.    Lucas Witt, a statistician, is hired by ADVANCEMED, designed the SSOE for the

audit of Plaintiff

166.    ADVANCEMED chose a bias sample, they did not show the Universe of selection

and the extrapolation was invalid, and defines the bias ADVANCEMED chose with the precision

rate of ADVANCEMED's audit being only 49% confidence level, as the normal confidence level

is 80% at the lower level, which establishes an invalid audit, with a 90% demand amount, again,

demonstrating an invalid audit.

167.    Office of Medicare Hearings and Appeals (OMHA) sends Plaintiff a document

regarding Steve Goga as his Administrative Law Judge.

168.    Expert Podiatrist, Adrianne Ross, DPM reviewed Avulsion services and determined

that most or all of them meet medical necessity criteria.

169.    ALJ erred in upholding denial of Expert Podiatrist, Adrianne Ross, DPM -

4/27/2020 reviewed fifty (50) of Plaintiff's clients and cases and determined they were within the

standard of care and also created a spreadsheet and addressed the auditors incorrect denied

payments regarding nail avulsions since Plainitff did not use injections, as injections can actually

affect the patients negatively.

170.    Medical Coding Issues: Applicable Law and Regulations Specific Coding Issues Applicable to The Appeal Dr. Goldfaden's Liability Should be Limited Under Section 1879 Dr. Goldfaden is Presumed to be "Without Fault" as to All Services Paid Prior to January 1, 2016 ADVANCEMED's Statistical Sampling and Extrapolation Should be Stuck Down.

171.    The second 2022 statistical report states that as of May 12, 2019 ADVANCEMED never reported their findings from the probe audit to review more information on the extrapolation to determine overpayments, after documented educational intervention has failed to correct the payment error.

172.    ADVANCEMED could not establish the Universe and could not define the details of the methodology and assumptions for its use and were not provided; as such ADVANCEMED failed to meet requirements of 8.4.1.4. Section 4 and also 8.4.4.4.1. of the MPIM.

173.    ADVANCEMED did not meet the fifth conjunctive requirements of 8.4.2 of the MPIM to accurately measure the variable of interest.

174.    "Of the 50 claims audited and extrapolated to the sampling frame of 4,037 claims, 90.5% were denied based on the argument "Not Medically Necessary", but medical necessity is a concept which has not be operationally defined."

175.    ADVANCEMED only audited "paid" claims and ignored unpaid claims, which is invalid as they must consider both paid and unpaid claims and as such their practices are trapping people with false audit amounts and not showing the evidence or "Universe" after their review.

176.    C2C Innovative Solutions, sent a letter to West regarding the Medicare payments, acknowledging they were stopping all payments and to take their case to the appeal level, and also addressed the timeline of sixty (60) days to file.

177.    WPS findings are all coded regarding the services they turned away.

178.    Dated December 19, 2019 is the breakdown of the 121 claims and their denial categories, which ADVANCEMED sent to Samuel Bernstein (Plaintiff's attorney).

179.    The Administrative Appeal process includes 5 tiers: First Tier – Redetermination Second Tier - Reconsideration

180.    Third Tier - Administrative Law Judge Fourth Tier - Medicare Appeals Council Fifth Tier - Federal District Court

181.    The Third Tier: Administrative Law Judge (ALJ) is the most common area for resolution (95%), however, the backlog is between 3-5 years plus; during this time, the company charges interest, collect against them and their credit, terminates their ability to collect, and ultimately terminates their practice/company.

182.    The ALJ Judge, Steve Goga did not review the documentation regarding Plaintiff's case and stated that Plaintiff and West did not provide the FOIA information, despite the September 11, 2019 letter being attached to the materials.

## RELEVANT LAW

*183.*    42 C.F.R. §405.372(b)(2) states *inter alia:*

(b) Rebuttal

(2) If prior notice is not required. If, under the provisions of paragraphs (a)(2) through (a)(4) of this section, a suspension of payment is put into effect without prior notice to the provider or supplier, the Medicare contractor **must**, once the suspension is in effect, give the provider or supplier an opportunity to submit a rebuttal statement as to why the suspension should be removed.

184.    §405.375(a) and §8.3.2.2.5 of the Medicare Program Integrity Manual ("PIM") **requires** that ADVANCEMED provide a response to the Provider's Rebuttal Statement within 15 calendar days from receipt of the rebuttal statement.

185.   §405.375(a) requires *inter alia*:

Submission and disposition of evidence. If the provider or supplier submits a statement…under 405.372(b)(2), why a suspension should be terminated, CMS, the intermediary, or carrier must within 15 days, from the date the statement is received, consider the statement (**including any pertinent evidence submitted), together with any other material bearing upon the case**, and determine whether the facts **justify** the suspension, offset, or recoupment or, if already initiated, justify the termination of the suspension, offset or recoupment. (Emphasis added).

186.   §405.375(b) requires *inter alia*:

(b) Notification of determination. The Medicare contractor must send written notice of the determination made under paragraph (a) of this section to the provider or supplier. The notice **must contain <u>specific findings</u> on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination.** (Emphasis added).

187.   §8.3.2.2.5 of the PIM states:

Review of Rebuttal – Because suspension actions are not appealable, the rebuttal is the provider's only opportunity to present information as to why suspension action should be not be initiated or should be terminated. ZPICs **shall carefully review the provider's rebuttal statement and pertinent information, and shall consider all facts and issued raised by the provider**. **(Emphasis added).**

188.   Section 1.7.1 (Medical Review) and 2.4.1 (Benefit Integrity) of the Zone Program Integrity Statement of Work ("SOW") as published by CMS require that ZPICs, including ADVANCEMED, perform reviews in accordance with the PIM.

189.   To be sure §1.3.3. of the PIM states that ZPICs "shall follow all sections of the PIM" and "shall follow the PIM to the extent outlined in their [Statement of Work]s." See also *Reg'l Med. Transp., Inc. v. Highmark, Inc.*, 541 F. Supp. 2d 718 (PA E.D., 4/2/2008).

<u>**COUNT I (MANDAMUS) – ALL PARTIES**</u>

190.   GOLDFADEN realleges and incorporates by reference ¶¶ 1-189.

191.   The Secretary, through its ZPICs, has a plainly defined and nondiscretionary duty to properly and completely respond to GOLDFADEN's Rebuttal Statement, including but not limited to a review additional documentation, including medical records pursuant to §405.375(a) and

192.   §8.3.2.2.5 of the PIM. The Secretary has failed to carry out that duty.

193.   GOLDFADEN has been irreparably injured because of the Secretary's failure to carry out that duty.

194.   GOLDFADEN has an adequate remedy at law to redress the Secretary's violation the requirement under §405.375(a) and §8.3.2.2.5 of the PIM, however the failure of the Secretary to ensure the enforcement of the remedy at law has deprived GOLDFADEN of its rights of review.

195.   That GOLDFADEN through its Rebuttal Statement and communications, has requested the Secretary through ADVANCEMED to review the additional documentation, including medical records, however such request was denied.

196.   Our Federal Courts have recognized the "withholding of payments, which may be properly due, is a deprivation which may itself punish or destroy the supplier." *Electro- Therapeutics, Inc. v. Bowen*, 1988 U.S. Dist. LEXIS 998 (NY S.D. Feb. 2, 1988).

197.   That GOLDFADEN respectfully seeks in Mandamus that this Honorable Court require the Secretary to complete the review and its review of the Rebuttal Statement in full and complete compliance with §405.375(a) and §8.3.2.2.5 of the PIM.

<u>**COUNT II (FRAUD) – ADVANCEMED ONLY**</u>

198. That GOLDFADEN does not seek recovery from the Secretary, CMS or DHHS under Court I at this time.

199. GOLDFADEN realleges and incorporates by reference ¶¶ 1-197.

200. That pursuant to 42 USC 1320c-6(b), ADVANCEMED may be found civilly liable under the law of the United States or of any state where due care was not exercised in the performance of its duties, function or activities.

201. That at all times relevant, ADVANCEMED had an obligation as a ZPIC to follow all applicable laws relating to rebuttal statements to payment suspensions.

202. That ADVANCEMED's notice of payment suspension was unlawful.

203. That GOLDFADEN relied upon his right to provide for review additional documentation including medical records.

204. That GOLDFADEN expended significant resources and financial capital to prepare and transmit the response to ADVANCEMED.

205. That the representations made in the original payment suspension and thereafter by ADVANCEMED are false.

206. That GOLDFADEN had a right to rely upon and did rely to its detriment upon ADVANCEMED's representation that the review would be conducted lawfully and with proper motives and that ADVANCEMED would review the additional documents.

207. That ADVANCEMED's actions in failing to review the medical records are upon information & belief were not authorized by the Secretary.

208. That the above conduct of ADVANCEMED were in derogation of its obligation of due care to follow the well settled review requirements as imposed by the Medicare Act and applicable rules and regulations.

209.     That ADVANCEDMED was aware of the obligations of the Medicare Act and applicable rules and regulations relating to the review of rebuttal statements and additional documents and ADVANCEMED's failure of review in light of such knowledge was international and in derogation of its obligation of due care.

210.     That had GOLDFADEN known that ADVANCEMED representations were untrue (i.e. that ADVANCEMED would review the additional documents in violation of the law), GOLDFADEN could have taken timely and additional steps to avoid further damages.

211.     That GOLDFADEN's reliance upon ADVANCEMED's representation, has resulted in the continued payment suspension and has had to expend significant financial resources to maintain his practice and is at great risk of significant present and future financial damages including in the loss of profit due to having to close down his practice due to the sheer lack of funds to meet financial obligations.

212.     That GOLDFADEN continues to suffer financial harm in his failure to continue his practice as well as in litigation costs sustained because of the misrepresentations.

WHEREFORE, GOLDFADEN requests that the Honorable Court enter a judgment and decree:

A.     That pursuant to the doctrine of Mandamus, order the Secretary to immediately order a review GOLDFADEN's Rebuttal Statement and additional information in its entirety including but not limited to the additional documentation submitted;

B.      That this Honorable Court find and declare that ADVANCEMED

materially mispresented that it would & did review GOLDFADEN's

Rebuttal Statement and additional documentation, and that such material

misunderstanding was fraudulent;

C.      That this Honorable Court find and declare that ADVANCEMED breached

its duty of due care including its failure to review the additional documents

submitted by GOLDFADEN in derogation of the Medicare Act and all

applicable rules and regulations;

D.      That GOLDFADEN had a right to rely and did rely upon

ADVANCEMED's representations to its detriment;

E.      That this Honorable Court grant judgment in favor of GOLDFADEN against

ADVANCEMED in the form of actual damages, punitive damages,

attorney's fees and costs of suit;

F.      That this Honorable Court immediately order a stop to collection and non-

payment actions by Defendants; and.

G.      Such other or further relief as the Court may deem just and proper.


Respectfully submitted,

TYLER LAW FIRM, PLLC

/s/ **BA Tyler**
B. A. TYLER (P25404)
Attorney for Plaintiff
3001 W. Big Beaver Rd., Suite 110
Troy, Michigan  48084
(248) 458-6600
btyler@tyler-legal.com

Dated:  November 13, 2024

Dated: 11/13/24

_Howard Goldfaden DPM_
HOWARD GOLDFADEN, DPM

Subscribed and sworn to before
me on 13th day of November 2024

_Nicole C Carbary_

NICOLE C. CARBARY
Notary Public, State of Michigan
County of St. Clair
My Commission Expires Nov. 19, 2026
Acting in the County of Oakland

31